UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael Robinson, *et al.*   )<br>                                             )<br>     Plaintiffs,                      )<br>                                             )<br>     v.                                    )<br>                                             )     Civil Action No. 15-cv-00803 (KBJ)<br>Brandon Farley, *et al.*        )<br>                                             )<br>     Defendants.                   )<br>_____) | |

# STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

## INTRODUCTION

Plaintiff Michael Robinson alleges that officers of the District of Columbia violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, when they failed to reasonably accommodate his disabilities during his arrest and post-arrest proceedings. The District of Columbia has moved to dismiss the ADA claim, arguing that "no D.C. Circuit case has held that the ADA applies to arrests," and "there are good reasons why the ADA . . . should not apply to arrests." Def. D.C.'s Reply in Supp. of Mot. to Dismiss (ECF No. 31) at 9. The District of Columbia further argues that plaintiff has not cited any "provision from [the ADA] identifying specific duties and accommodations that are appropriate during the arrest of a disabled suspect." Def. D.C.'s Mot. to Dismiss (ECF No. 20) at 9.[1]

The United States files this Statement of Interest to clarify that Title II of the ADA applies to the arrest of an individual with a disability, and to explain the application of Title II's

---

[1] Plaintiffs also allege that officers of Prince George's County violated Title II of the ADA, and Prince George's County has moved (ECF No. 17 at 1, 11) to dismiss Count IV of plaintiffs' complaint, which contains the ADA claim. However, Prince George's County's motion discusses only the § 1983 component of Count IV, and does not offer any reason that the statutory claim should be dismissed. *Id.* at 6.

reasonable modification requirement in this context.[2] *See* 28 U.S.C. § 517 (the Attorney General may send any officer of the Department of Justice "to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States"). The United States Department of Justice ("DOJ") has the primary responsibility for enforcing the ADA, and oversees the implementation of Title II for "[a]ll programs, services, and regulatory activities relating to law enforcement." 28 C.F.R. § 35.190(b)(6). The United States therefore has a particularly strong interest in ensuring the correct interpretation and application of the ADA in this context.

## FACTUAL ALLEGATIONS

All of the following facts are drawn from plaintiffs' second amended complaint (ECF No. 33-1). At the motion to dismiss stage, "the facts as alleged in the complaint are taken as true and all reasonable inferences therefrom are drawn in the plaintiff's favor." *Wood v. Dep't of Labor*, 275 F.3d 107, 108 n.2 (D.C. Cir. 2001).

Plaintiff Michael Robinson alleges that he has cerebral palsy and intellectual disabilities. Second Am. Compl. ¶¶ 1, 127. As a result, he is small (5'3" and 127 pounds), has an atrophied arm, and has difficulty walking, processing information, and speaking. *Id.* ¶ 56. Mr. Robinson was sitting at a bus stop near his house in the District of Columbia on the morning of May 30, 2014, waiting to run an errand for his family. *Id.* ¶¶ 1, 2, 57. A police officer assisting in the search for suspects in a recent car theft noticed Mr. Robinson and observed him for a few minutes. *Id.* ¶¶ 57, 58. Frightened, Mr. Robinson stood up to walk home. *Id.* ¶¶ 2, 57. The officer

---

[2] *See* Br. for the United States as Amicus Curiae at 9-17, *Sheehan v. City & Cnty. of San Francisco, Cal., et al.*, No. 13-1412 (S. Ct. Jan. 16, 2015) (stating that Title II applies to arrests); Statement of Interest of the United States of Am. at 11-17, *Williams v. City of New York*, No. 12-cv-6805 (S.D.N.Y. Feb. 25, 2015) (ECF No. 69) (same); Statement of Interest of the United States at 30-34, *S.R. & L.G. v. Kenton Cnty., et al.*, No. 15-cv-143 (E.D. Ky. Oct. 2, 2015) (ECF No. 32) (same).

2

shouted obscenities at him and pursued him. *Id.* ¶¶ 3, 58, 59. Mr. Robinson stopped and, when asked for identification, gave the officer his disability identification card. *Id.* ¶ 59. Mr. Robinson then tried to return home, but the officer pursued him into his apartment building, hit him, threw him down the steps, and tased him. *Id.* ¶¶ 3, 60, 61. Mr. Robinson then ran to his apartment and hid in the bathroom. *Id.* ¶¶ 3, 5, 61, 67, 71. Mr. Robinson was not armed and did not threaten the police officer in any way during these events. *Id.* ¶¶ 3, 6, 61.

Mr. Robinson's grandmother and several neighbors tried to explain to the police officer that Mr. Robinson was disabled and posed no threat to them. *Id.* ¶¶ 4, 63, 66, 68, 69, 72. Without discussing the situation with Mrs. Robinson or the neighbors, the officer summoned backup; eventually, twenty-nine police vehicles were gathered at the scene. *Id.* ¶¶ 4, 5, 65, 68, 72. Several officers entered Mr. Robinson's apartment with weapons drawn. *Id.* ¶¶ 4, 5, 68, 70. They found him unarmed in the bathroom, beat him, and handcuffed him. *Id.* ¶¶ 5, 71, 73. After treatment at a hospital, Mr. Robinson was charged with misdemeanor assault on a police officer and held overnight at the District of Columbia Department of Corrections. *Id.* ¶¶ 5, 7, 75. The next day, he was taken to the courthouse and the charge of misdemeanor assault was *nolle prosequied*. *Id.* ¶¶ 7, 76. Mr. Robinson was then released alone outside the courthouse; no attempt was made to contact his family. *Id.* ¶¶ 7, 76. He stayed outside, "alone and frightened," until his uncle – who had fruitlessly waited six hours to hear Mr. Robinson's case after being given the wrong courtroom information – eventually learned that Mr. Robinson had been released and found him wandering near the courthouse. *Id.* ¶¶ 7, 77.

**DISCUSSION**

*A.  Statutory and Regulatory Background*

Under Title II of the ADA, a public entity cannot "den[y] the benefits of [its] services, programs, or activities" to a qualified individual with a disability, or subject any such individual to discrimination. 42 U.S.C. § 12132. In enacting the ADA, Congress found that individuals with disabilities continually encounter discrimination in critical areas such as access to public services, including both outright intentional exclusion and the failure to make modifications to existing practices. *See id.* § 12101(a)(3), (a)(5). Title II of the ADA was enacted as a broad remedy to this widespread discrimination. *See id.* § 12101(b).

The DOJ has promulgated a regulation implementing Title II's broad nondiscrimination mandate. *Id.* § 12134; 28 C.F.R. Pt. 35. The regulation prohibits a public entity from providing services to individuals with disabilities that are "not as effective in affording an equal opportunity to obtain the same result . . . as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii). Consistent with the statute, the regulation both prohibits outright discrimination and requires a public entity to "make reasonable modifications in policies, practices, or procedures when . . . necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). This regulation is entitled to "controlling weight" so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). The Supreme Court has credited DOJ's interpretation of Title II as implemented by the regulation. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999).

### B.  Analysis

#### 1.  *Title II Applies to All Law Enforcement Activities, Including Arrests*

The starting point in determining Title II's applicability to law enforcement operations is the statutory text. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998). Title II's antidiscrimination provision provides that no qualified individual with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by *any* such entity." 42 U.S.C. § 12132 (emphasis added). By its plain terms, Title II applies to all governmental entities, including law enforcement agencies. The statutory text contains no "exception that could cast the coverage of" law enforcement entities "into doubt." *Yeskey*, 524 U.S. at 209 (holding that state prisons "fall squarely within the statutory definition of 'public entity'" in Title II). Accordingly, law enforcement agencies fall within the ADA's comprehensive definition of a public entity.

The statutory text further demonstrates that arrests are covered by Title II. "[S]ervices, programs, or activities," 42 U.S.C. § 12132, is an all-inclusive phrase that covers everything a public entity does. *See, e.g.*, *The Random House Dictionary of the English Language* 20 (2d ed. 1987) (defining "activity" as "a specific deed, action, function, or sphere of action"); *see also Yeskey*, 524 U.S. at 211 (prison operations constitute "programs, services, [or] activities" under Title II, regardless of whether participation is mandatory or voluntary). Congress defined the term "[p]rogram or activity" in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-797, which served as the model for Title II, to mean "*all* of the operations of" a covered entity. *See* 29 U.S.C. § 794(b) (emphasis added). Because Title II cannot "be construed to apply a lesser standard than the standards applied under" Section 504, 42 U.S.C. § 12201(a), the phrase

"service, programs, or activities" has the same broad meaning under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998).

The legislative history confirms that Congress intended Title II to apply to law enforcement operations generally, and to arrests in particular. The House Report specified that Title II's anti-discrimination mandate would "extend[ ] . . . to *all* actions of state and local governments." H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 2, at 84 (1990) (emphasis added). The Report further identified arrests as an activity where "discriminatory treatment based on disability can be avoided by proper training." *Id.* Pt. 3, at 50. In addition, legislators emphasized that Title II would address discrimination in law enforcement, including the arrest of individuals with disabilities. *See, e.g.*, 136 Cong. Rec. 11,461 (1990) ("Many times, deaf persons who are arrested are put in handcuffs. But many deaf persons use their hands to communicate. . . . [T]hese mistakes . . . constitute discrimination."); *id.* at E1913, E1916 (daily ed. June 13, 1990) ("[P]ersons who have epilepsy are sometimes inappropriately arrested because police officers have not received proper training to recognize seizures and to respond to them.").

Similarly, the Title II regulation makes clear that Title II of the ADA applies to both law enforcement and arrests. The regulation explains that Title II's nondiscrimination requirement "applies to anything a public entity does." 28 C.F.R. Pt. 35, App. B. In its commentary on the Title II regulation, DOJ stated that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 56 Fed. Reg. 35,703 (July 26, 1991).

Pursuant to the Congressional mandate to provide guidance to covered entities, 42 U.S.C. § 12206, the DOJ has issued technical assistance to guide law enforcement entities in complying

with the ADA, including in the context of arrests. This technical assistance confirms that DOJ has long viewed Title II as applying to arrests. Guidance issued in 2006 states that "[t]he ADA affects virtually everything that officers and deputies do," including "arresting, booking, and holding suspects."[3] In addition, the DOJ's Title II Technical Assistance Manual states that "[a] municipal police department encounters many situations where effective communication with members of the public who are deaf or hard of hearing is critical," including "interviewing suspects prior to arrest," and "interrogating arrestees."[4]

Consistent with the foregoing, the majority of appellate courts to consider the issue have held that Title II applies to arrests. *See Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1217 (9th Cir. 2014) (joining the "majority of circuits" and holding that the ADA applies to police interactions), *rev'd in part on other grounds by* 135 S.Ct. 1765 (2015); *Seremeth v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 673 F.3d 333, 338-40 (4th Cir. 2012) ("[t]he ADA applies to the investigation of criminal conduct"); *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (police department is a public entity and an arrest is a program or service). Only the Fifth Circuit has held that Title II does not apply to law enforcement activities in "exigent circumstances . . . prior to the officer's securing the scene and ensuring that there is no threat to human life," but that court nonetheless found that Title II did apply "[o]nce the area was secure and there was no threat to human safety." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *but see Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (disagreeing with *Hainze* analysis and explaining that "[t]he exigent circumstances presented by criminal activity

---

[3] U.S. Dep't of Justice, *Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement* § I, question 2 (Apr. 4, 2006), *available at* https://www.ada.gov/q&a_law.htm ("2006 Guidance").
[4] U.S. Dep't of Justice, *Americans with Disabilities Act: Title II Technical Assistance Manual 1994 Supplement* § II- 7.1000(B), illus. 3 (Nov. 1993 & Supp. 1994), *available at* http://www.ada.gov/taman2up.html.

. . . go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance"). The one court in this district to address the question found that Title II did apply to arrests. *Sacchetti v. Gallaudet Univ.*, No. 15-cv-455, 2016 WL 1589814, at *14 (D.D.C. Apr. 20, 2016).

Thus, pursuant to the statutory text and applicable regulation, and in accordance with the majority of authority, Title II's nondiscrimination requirement applies to arrests.

### 2. *Law Enforcement Entities Are Required to Make Reasonable Modifications to Policies, Practices, or Procedures in Arresting Individuals with Disabilities*

Because law enforcement entities are subject to Title II's nondiscrimination requirement, they must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (the "failure to accommodate persons with disabilities will often have the same practical effect as outright" discrimination). The reasonable modification requirement extends to the arrest of an individual with a disability.

The District of Columbia argues that plaintiffs have not cited any "provision from [the ADA] identifying specific . . . accommodations that are appropriate during the arrest of a disabled suspect." D.C. Mot. to Dismiss (ECF 20) at 9. Determining what modifications are reasonable in any given situation is a fact-specific inquiry. In the law enforcement context, questions of exigency and safety will play a large role in determining whether a particular modification is reasonable. *See, e.g.*, *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009) ("exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA"); 28 C.F.R. § 35.139(a) (a modification is not required if it would interfere with an entity's ability to address a significant safety threat). In its technical assistance, DOJ has explained that Title II may require a police department to, for instance,

"modif[y] its regular practice of handcuffing arrestees behind their backs, and instead handcuff[ ] deaf individuals in front in order for the person to sign or write notes."[5] Similarly, "an interpreter may be needed in lengthy or complex transactions" involving a deaf arrestee.[6] The Police Executive Research Forum, a national membership organization composed of chief executives from municipal, county, and state law enforcement agencies, has compiled suggestions of modifications that may be appropriate in some circumstances, including:

1. Recognizing that an individual may be overwhelmed, and removing distractions from the scene.
2. Obtaining relevant information from family members, friends or others at the scene who know the individual and his history.
3. Asking an adult member of the individual's family to participate in transport.
4. Speaking slowly, simply, and briefly; limiting the number of people who speak to the individual; maintaining a comfortable distance from the individual.[7]

Because the determination whether a requested modification is reasonable or creates a fundamental alteration is a fact-specific, individualized question, discovery is often necessary. *See Sacchetti*, 2016 WL 1589814, at *14 (denying defendants' motion to dismiss and holding that "[w]hether the plaintiffs can establish that the MPD officers' alleged conduct amounted to a denial of reasonable accommodations for [his] disabilities is a question properly reserved for resolution until a meaningful opportunity for discovery is provided."); *Gorman*, 152 F.3d at 914 ("The factual record will need to be further developed . . . before the remaining issues of potential liability [on the arrestee's ADA claim] and possible relief are determined."); *Sheehan*, 743 F.3d at 1233 ("because the reasonableness of an accommodation is ordinarily a question of

---

[5] 2006 Guidance, *supra* note 3, § V.
[6] U.S. Dep't of Justice, *Communicating with People Who Are Deaf or Hard of Hearing: ADA Guide for Law Enforcement Officers* (Jan. 2006) (under "What Situations *Require* An Interpreter?"), *available at* https://www.ada.gov/lawenfcomm.htm.
[7] Police Executive Research Forum, *The Police Response to People with Mental Illnesses: Including Information on the Americans with Disabilities Act Requirements and Community Policing Approaches* 29-30, 34, 54, MP-5 (1997), *available at* www.ptb.state.il.us/resources/mentalillness/mpoliceresponse.pdf.

fact . . . we hold that the city is not entitled to judgment as a matter of law on [the arrestee's] ADA claim").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

Respectfully submitted this 20th day of June, 2016.

        VANITA GUPTA
        Principal Deputy Assistant Attorney General
        Civil Rights Division

        EVE L. HILL
        Deputy Assistant Attorney General
        Civil Rights Division

        REBECCA B. BOND
        Chief
        KATHLEEN P. WOLFE
        Special Litigation Counsel
        Disability Rights Section
        Civil Rights Division

        <u>/s/ Elisabeth M. Oppenheimer</u>
        ELISABETH M. OPPENHEIMER
        Bar No. Massachusetts 686312
        Trial Attorney
        Disability Rights Section
        Civil Rights Division
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W. – NYA
        Washington, D.C.  20530
        Telephone:  (202) 616-3653
        Facsimile:  (202) 305-9775
        elisabeth.oppenheimer@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that Statement of Interest, filed through the CM/ECF system on this 20th day of June 2016, will be sent electronically to the registered participates as identified on the Notice of Electronic Filing (NEF).  I am not aware of any non-registered participants, so electronic filing is the sole means of service of this document.

                                                             /s/ Elisabeth Oppenheimer
                                                             Elisabeth Oppenheimer